**ALVEY, INCORPORATED,**
Respondent/Cross–
Appellant,

v.

**MISSOURI INSURANCE GUARANTY ASSOCIATION, Appellant/Cross–
Respondent.**

No. 68060.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 26, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 30, 1996.

Application to Transfer Denied
June 25, 1996.

Kevin P. Schnurbusch, Mary Anne Lindsey, Evans & Dixon, St. Louis, for appellant.

Morris E. Stokes, Bradley D. Kuhlman, Stokes & O'Malley, P.C., Clayton, for respondent.

SMITH, Presiding Judge.

The trial court entered a judgment against Missouri Insurance Guaranty Association (MIGA) and in favor of Alvey, Incorporated (Alvey) for $214,829.15 and $3,271.68. The first amount arose from settlement by Alvey of a personal injury claim against it by Eddy Burch in Texas. The second arose from defense of a claim by Richarda Muniz in New York. Alvey's liability insurance company, Integrity Insurance Company, had been declared insolvent. Both parties appeal.

Integrity issued two policies of liability insurance to Alvey. The first (primary policy) was a comprehensive general liability policy which provided coverage for bodily injury with limits of $500,000 with a $2,500 deductible. The second policy (excess policy) provided coverage for bodily injury up to $15 million upon exhaustion of the primary policy. On March 24, 1987, Integrity was declared insolvent by order of the Superior Court of New Jersey. That insolvency led to the involvement of MIGA in the two actions brought against Alvey for personal injury.

The first action was brought by Eddy Burch, an electrician and maintenance man for the Houston Coca–Cola Bottling Company, who sustained injuries while repairing a machine manufactured by Alvey. The second action was filed by Richarda Muniz in New York for personal injuries sustained while using equipment allegedly designed by Alvey, but in fact neither designed nor built by Alvey. Count one of Alvey's action against MIGA arises from the Burch suit; count two from the Muniz suit.

## THE BURCH CLAIM

Burch sought $2,650,000 from Alvey. Transportation Insurance Company filed a petition for intervention as Burch's employer's workers' compensation carrier. It sought subrogation recovery of medical treatment benefits provided to Burch in the amount of $105,406.44 and disability benefits paid to Burch of $35,887 for a total of $141,293.44.

In June 1987 Alvey filed proofs of claim on the Burch action under both the primary and excess policies with the Liquidator of Integrity. In August 1987, MIGA, which has statutory obligations discussed more fully hereafter concerning claims against insolvent insurers, informed counsel for Alvey of the referral of the Burch action to a law firm to provide a defense for Alvey. Thereafter, Alvey submitted invoices from the law firm for services and litigation expense to MIGA which paid them.

On July 8, 1988, MIGA's general counsel wrote Alvey's counsel, Morris Stokes, the following:

It is MIGA's position that CNA's [Transportation's] subrogation claim for the workers' compensation payments made by CNA to [Burch] would not be a covered claim because it is a claim made by an insurer. Further, Alvey, the insured, may also be protected by the act for any subrogation claim made by an insurer. Accordingly, we would recommend and suggest that the insured raise as a defense in the Texas case that it is not obligated to CNA for the amount of CNA's subrogation interests. [ . . . ] It is my understanding that $112,862.47 of the workers' compensation insurer's subrogation claim is for medical expenses and $35,887.00 is for settling plaintiff's claim for permanent total and for temporary total disability paid. In effect, these payments represent payment for lost wages. It is also my understanding from the documents supplied me that there may be a total of $11,194.00 in lost wages that have not been compensated by the workers' compensation insurer.

Mr. Taylor [counsel supplied to Alvey by MIGA] suggests in his June 14, 1988 letter to Walter Brennan that Alvey may attempt to settle the workers' compensation claim with the workers' compensation carrier in exchange for an assignment of the work-

ers' compensation lien and that Alvey would then waive the workers' compensation lien. If this were done, MIGA would take the position (1) that Alvey acted as a volunteer in making the payments to the workers' compensation carrier since Alvey did not owe the amount of said claim and/or (2) that there are no unpaid medical and lost wages, except for possibly the $11,194.00 amount mentioned above, and accordingly MIGA would have no obligation under the act to pay any additional amount in settlement of Burch's claim or on any judgment entered against Alvey in the Texas court.

Later that month Alvey received a settlement demand from Burch's attorney in the amount of $750,000. On August 31 Stokes wrote to MIGA demanding that it participate in settling the case. That letter stated:

> I must make demand on behalf of Alvey, Inc., that you [settle] the *Burch* case within the monetary limits of your coverage. I consider this to be six hundred thousand dollars ($600,000). If you fail to do this, Alvey, Inc., will look to MIGA for full indemnification and reimbursement of any judgment that may be rendered against it, even in excess of the six hundred thousand dollar ($600,000) coverage afforded by MIGA under the two policies applicable to this case.

MIGA made no response to that request prior to October 14, 1988, when Alvey settled with Burch for $401,000. The settlement between Alvey and Burch was recited to be to compensate Burch for "future lost wages and past lost wages to the extent not paid to me by any other party." Additionally, in October 1988, Burch settled with Transportation by which Burch was released from claims of Transportation in exchange for payment to Transportation of $94,398.85.

The trial court found that MIGA had waived its right to any defense premised on violation of the Integrity policy by Alvey

because MIGA had abandoned or failed to continue the defense of Alvey. The court ordered MIGA to pay Alvey $214,829.15 which was calculated by subtracting the amount of the workers' compensation lien settlement, $94,395.85, from MIGA's statutory limit of $299,800, and then adding back $9425 as an amount of unpaid wages of Burch not paid by workers' compensation. In addition the court awarded Stokes attorney's fees in the amount of $7,998.71, as the value of Stokes services in evaluating and settling the Burch action. Both parties appeal.

MIGA is created by statute. § 375.785.[1] It is a nonprofit unincorporated legal entity whose membership consists of all insurers transacting certain types of insurance business within this state. The members are assessed on a *pro rata* basis to cover the obligations of MIGA. Because the obligations of MIGA are ultimately paid by purchasers of insurance, the legislature has imposed limitations on the obligations of MIGA. Those obligations are not co-extensive with those of the insurers themselves. When an insurer becomes insolvent, MIGA is "deemed the insurer *to the extent of its obligations on the covered claims* and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." § 375.785.4(b) (Emphasis supplied).

A "covered claim" is an unpaid claim presented within the time specified in the statute which arises out of and is within the coverage of a policy issued by a now insolvent insurer. A covered claim does not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. § 375.785.3(2). This provision makes it apparent that the legislature intended MIGA to serve as a protection for insureds and claimants, not for other insurance companies. *Qualls v. Missouri Insurance Guaranty As-*

---

1. For purposes of this opinion, unless otherwise indicated, statutory references will be to RSMo 1986, the statute in effect at the time of Integri-

ty's insolvency and of Alvey's settlement. The statute has been amended since.

*sociation,* 714 S.W.2d 732 (Mo.App.1986) [2]; *Garrett v. Overland Garage & Parts, Inc.,* 882 S.W.2d 188 (Mo.App.1994) [17–20]. In 1989 the statute was amended to provide that no subrogation right lay against any tortfeasor insured by an insolvent insurer except to the extent such subrogation claim exceeded the policy limits. § 375.772.2(2) RSMo 1989 Supp. That statute is not applicable to the case here, which involves a settlement occurring in 1988.

The statute further creates a deductible of $200 from the covered claim (except claims arising from a workers' compensation policy) and establishes a covered claim maximum of $300,000. § 375.785.4(1)(a). MIGA's maximum exposure for any covered claim is therefore $299,800.

The statute creates further restrictions on claims arising from bodily injury. The amount of an award in those cases shall not exceed reasonable medical expenses and any amounts lost or to be lost by reason of the claimant's inability to work and earn wages or salary or their equivalent. § 375.785.4(1)(a)b.

A third party having a covered claim against an insured of an insolvent insurer *may* present that claim to MIGA for it to process. Doing so constitutes an unconditional general release of all liability of such insured in connection with such claim. § 375.785.4(1)(a)c. Burch did not elect to present his claim to MIGA under this section and so retained all rights he had against Alvey. An insured of an insolvent insurer who has a judgment against it is entitled to file the judgment with MIGA as a covered claim. MIGA is then to process the claim and determine which part of the judgment constitutes a covered claim based upon information provided by the insured. § 375.785.4(1)(a)c.

■ MIGA contends that it is entitled to assert as a defense to Alvey's claim the violation by Alvey of the Integrity policy provision requiring the insurance company's consent to settlement of the claim. MIGA contends that it acquires all rights of the insolvent insurer and is entitled to invoke the no-settlement-without-consent provision as a defense. Alvey counters that MIGA abandoned its defense by its refusal to settle and therefore cannot invoke the policy defense. MIGA places its reliance on *King Louie Bowling Corporation of Missouri v. Missouri Insurance Guaranty Association,* 735 S.W.2d 35 (Mo.App.1987). Alvey bases its contention on a line of cases, mentioned in footnote 4 of the *King Louie* case, originating from *St. Louis Dressed Beef and Provision Company v. Maryland Casualty Company,* 201 U.S. 173, 26 S.Ct. 400, 50 L.Ed. 712 (1906). *See also Landie v. Century Indemnity Company,* 390 S.W.2d 558 (Mo.App.1965) [3]; *Hyatt Corporation v. Occidental Fire & Casualty,* 801 S.W.2d 382 (Mo.App.1990) [5]. Those cases hold that where an insurance company refuses to defend in a suit brought against a policyholder, the latter need not suffer an adverse judgment, but may make the best settlement he can without jeopardizing the right to recover from the insurer. Those cases normally involve questions of coverage.

*King Louie* involved a situation in which two patrons of an insured fell and were injured on the insured's premises. The insured's insurance company investigated the claims and after suits were filed, provided a defense. The insurance company then became insolvent. The claimants declined to file claims with MIGA. The insured then settled the claims and filed a claim against MIGA to recoup the settlement payments. The court held that there was no authority under the statute for recoupment for a settled claim. The language of the opinion suggests that MIGA lacks the capacity to become involved in any claim not brought directly by the third party claimant or reduced to judgment. The *King Louie* case involved claims against the insured which were never apparently presented to MIGA until after settlement. In that regard it is distinguishable from the situation before us. We entertain considerable doubt, as apparently does MIGA also, that MIGA has no

authority to involve itself in a claim against an insured of any insolvent insurer not presented directly to MIGA by the third party claimant. Here, confronted by that situation, MIGA provided a defense as the insolvent insurer would have been required to do. That is one of the duties or obligations the insolvent insured had to which MIGA succeeds.

We find it difficult to conclude here that MIGA "abandoned" Alvey in the way that term is normally used in the line of cases cited above. We believe a different analysis is required. The policy defense arises from a contract between Integrity and Alvey. The policy provision involving settlement is for Integrity's benefit. Within policy limitations and in the absence of coverage issues, the interests of an insured and the insurer in a personal injury case are nearly identical. That for which the insured is liable the insurer is bound to pay. It is within that context that the no-settlement-without-consent provision is included within the contract. The insurance company does not agree to be bound by a settlement to which it has not consented, for it is the insurance company's money which is being used for settlement and its policy insists that it remain in control of the obligation which it assumes.

However, the interests of MIGA and the insured of an insolvent insurer are not identical but rather divergent. The insured has liability for all damages which have been sustained because of insured's fault. Those damages may considerably exceed the $299,800 statutory limitation of MIGA. The damages recoverable against the insured will in all probability include amounts, possibly large amounts, for damages not recoverable from MIGA, such as pain and suffering, disfigurement, consortium, subrogation, etc. We do not believe the statutory scheme envisages requiring an insured to either forego recovering from MIGA those items for which MIGA is statutorily responsible or risking a substantial personal judgment including large amounts which cannot be recovered from MIGA. The purpose of the no-settle-

ment-without-consent provision does not exist to protect MIGA pursuant to its statutory limitations on liability. Non-enforcement of such a provision creates no injury or prejudice to MIGA (as far as amounts it is required to pay) and furnishes substantial protection to the insured, who usually bears the most onerous financial burdens of its insurer's insolvency.

We hold that where the potential liability of the insured has diverged from the obligations of MIGA under the statute so that no reasonable person could expect MIGA to effect a settlement, then the provision of the underlying policy requiring consent of the insurer to settle does not provide a policy defense to MIGA on a claim arising from a settlement, provided the claim has been presented to MIGA prior to settlement and it has been afforded the opportunity to settle.

■ The settlement here meets these criteria. All medical expenses of Burch had been satisfied by the workers' compensation carrier and MIGA was not subject to a subrogation claim of that carrier. Under the statute in effect at that time, Alvey was presumably subject to such claim. Burch had also been paid for almost all of his lost work resulting from the accident by the workers' compensation carrier. He had returned to work and it was MIGA's position that the maximum in lost wages to which he was entitled was $15,000 or less. The lawsuit sought 2.65 million dollars in damages, and Burch sought $700,000 in settlement. While Burch had apparently made an excellent recovery, his injuries were severe, painful, disabling, disfiguring, and required extensive medical treatment exceeding in cost $100,000. The exposure of Alvey was substantial and in MIGA's view its own exposure was minimal. We find that any reasonable person would conclude that MIGA's perceived exposure and Alvey's potential exposure were so divergent that settlement by Alvey alone was reasonable and justified. MIGA had treated the claim of Burch as a "covered claim" but to a much lesser extent than sought by Burch. We find no breach of the Integrity policy by Alvey.

We turn now to the recovery. MIGA's liability under the statute is limited as we have previously discussed. The trial court used as its starting point in computing MIGA's liability the statutory cap of $299,800. Presumably this was based on the abandonment concept in which the insurer is bound by a reasonable settlement if its policy defenses fail. See *Hyatt Corporation, supra.* The court then made certain adjustments to that figure including setting off a portion of the workers' compensation payment received by Burch. This method is incorrect. The amount Alvey is entitled to recoup is that portion of the settlement which represents that which MIGA can pay under its statutory mandate. The beginning point of the computation is zero or an amount which MIGA concedes is part of the covered claim. No amount of the workers' compensation payment can be recouped. *Garrett v. Overland Garage, supra* [17–20], (dealing with the statute as later amended). Only the lost wages past and present (and any unpaid medical) which have not been covered by payment under workers' compensation can be recouped. That amount presents a question of fact to be determined by the finder of fact on the basis of evidence. The agreement between Burch and Alvey does not bind MIGA for it was not a party to that agreement. We do not base Alvey's right to recover from MIGA on bad faith or abandonment by MIGA. We simply have held that the no settlement provision of the policy does not bar Alvey from settling and seeking reimbursement from MIGA for that portion of the settlement for which MIGA has statutory liability.

The trial court expressed considerable doubt about the amount claimed by Alvey to represent lost future wages of Burch. We share that doubt. The documents presented in support of that claim, mostly statements by expert witnesses, were held by the trial court in memoranda supplementing its findings, not to be in evidence. We also agree with that assessment. While the parties have premised their arguments here on an implicit finding by the trial court that there were unpaid special damages in the amount of $214,829.15, the court made no express finding of special damages. Because we have resolved the initial issue of the existence of liability in MIGA we find it necessary to remand so that full development of the evidence covering the extent of lost past and future wages of Burch may be developed.

MIGA also premises error on the trial court allowance of $7998.71 to Stokes for his services in settling the Burch litigation on a quantum meruit basis. We think the record is adequate to support the trial court finding that MIGA benefitted from the Burch settlement, including termination of defense costs for the Burch action, which MIGA was paying.

On cross-appeal Alvey contends that the trial court erred in holding that the excess policy of Integrity did not "drop down" to afford Alvey another $300,000 in coverage. We find no merit to that contention for two reasons. First, the protection provided by MIGA is for a covered claim. The Burch claim is the covered claim and regardless of the amount of that claim, MIGA's liability as to it is $299,800. Secondly, the excess policy of Integrity specifically provides that it applies where the underlying insurance is "exhausted or reduced, *solely as the result of occurrences* taking place after the inception date of the policy". (Emphasis supplied). The definition of occurrences does not include the insolvency of the primary insurer. *Fred Weber, Inc. v. Granite State Insurance Co.,* 829 S.W.2d 589 (Mo.App. 1992) l.c. 593. The authority relied upon by Alvey was premised on the court's finding that the policy did not unambiguously specify that exhaustion of the policy be from causes other than insolvency of the primary insurer, as Integrity's excess policy does. *Federal Insurance Company v. Scarsella Brothers, Inc.,* 931 F.2d 599 (9th Cir.1991).

In view of our remand it is not necessary to review Alvey's contention that it was entitled to pre-judgment interest on the amount awarded by the trial court.

## THE MUNIZ ACTION

 Richarda Muniz filed suit for personal injuries against Alvey in New York on May 16, 1988. The suit was filed after March 24, 1988, the date set by the New Jersey court in the Integrity insolvency action as the last date for filing proofs of claim with the insolvent insurer's estate. Alvey was not served with the petition in the Muniz suit until September 23, 1988. On February 23, 1988, Alvey had filed an omnibus proof of claim with the liquidator of Integrity. The omnibus proof of claim was an effort to gain coverage for unknown claims such as Muniz, which might have occurred during the policy period, but were not known to Alvey prior to the bar date. On May 20, 1988, Alvey received the Liquidator's notice of determination confirming coverage for the omnibus claims.

Upon receipt of the Muniz petition, Alvey forwarded the summons and petition to MIGA, requesting MIGA to select defense counsel. MIGA responded on October 6, 1988, informing Alvey that it had:

> ... requested confirmation of coverage and acceptance of this case from Debra Carr with Integrity Insurance in liquidation. If indeed Integrity does accept this claim as timely filed, [...] then [MIGA] will also accept it as timely filed. Upon confirmation that Integrity will indeed accept this claim, then [MIGA] will take over the defense and pay all attorney fees from the date the law firm was retained.

Integrity in liquidation did deem the claim timely filed due to the timely filing of the omnibus claim. Shortly thereafter MIGA advised Alvey that the case had been referred to a law firm for defense and reimbursed Alvey for money already paid to that firm. In February 1989, Alvey filed with the liquidator specific proofs of claim for the Muniz action. MIGA continued to pay for Alvey's defense in that action until March 29, 1990, when it advised Alvey that the omnibus proof of claim was not timely filed because it did not specify the Muniz action. In November 1990, Alvey's motion for summary judgment was granted in the Muniz action. Alvey seeks to recover from MIGA $3,271.68 for legal defense fees paid by it to continue the defense of the Muniz action after MIGA's March 29 decision. The trial court awarded that amount to Alvey.

MIGA contends that the Muniz legal fees are not a covered claim because of the late filing of Alvey's specific proof of claim. It asserts that the liquidator's acceptance of the claim as timely does not make the filing timely as to MIGA.

The statute establishes the time requirements for claims as that established by the liquidating court. § 375.670.1. The obvious reason for that is so MIGA and other state guaranty associations may occupy the status of essentially preferred creditors in having their payments for covered claims reimbursed from the insolvent estate. § 375.785.9(3). MIGA does not under such a statutory plan suffer injury so long as the liquidator accepts the claim as timely filed. Courts have taken differing positions on the strictness with which the statutory time limits are to be enforced. We need not enter that discussion here.

MIGA advised Alvey that if the liquidator treated the Muniz claim as timely then MIGA would do the same. When the liquidator held the claim timely MIGA treated it as a covered claim and began providing a defense as called for under the Integrity policy. It continued in that posture until approximately six months before summary judgment for Alvey was entered. At that time it changed its mind and determined that it would no longer consider the claim timely filed. The record does not reflect that MIGA's ability to present the claim to the liquidator had in any way changed during the period when it was honoring the claim. Alvey relied on MIGA's assurances and we cannot find an absence of detriment to Alvey. A major policy reason advanced in some of the cases, precluding delay in distributing the insolvent company assets, is not present here. *See Satellite Bowl, Inc. v. Michigan*

*Property & Casualty Guaranty Association,* 165 Mich.App. 768, 419 N.W.2d 460 (1988); *Lake Hospital System, Inc. v. Ohio Insurance Guaranty Association,* 69 Ohio St.3d 521, 634 N.E.2d 611 (1994). Unlike *Satellite Bowl,* the liquidator has treated the Muniz claim as timely filed. We see no injury to the statutory scheme by holding MIGA to the promise it made to Alvey. The trial court correctly awarded Alvey the cost of defense paid by Alvey.

Judgment awarding Alvey defense costs in the Muniz claim is affirmed. Judgment awarding Alvey money in the Burch claim is reversed and remanded for further proceedings in accordance with this opinion.

GARY M. GAERTNER and RHODES RUSSELL, JJ., concur.